## STALWORTH v. GULF REFINING CO.
### (No. 6798.)

(Court of Civil Appeals of Texas. Galveston.
March 30, 1915. Rehearing Denied
April 22, 1915.)

1. MASTER AND SERVANT ☞289—CONTRIBUTORY NEGLIGENCE — CONNECTION WITH CAUSE OF INJURY.

Where a common laborer in charge of workmen, engaged in cleaning out oil tank cars, knew that they might contain gas, and that there was danger, but did not appreciate the extent thereof, whether he was guilty of a dereliction of duty in ordering a workman to enter a car that had not been blown out so that his widow could not recover for his death while he was endeavoring to rescue the workman was for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1089, 1090, 1092–1132; Dec. Dig. ☞289.]

2. MASTER AND SERVANT ☞288 — PLACE OF WORK—ASSUMPTION OF RISK—GAS.

The foreman of laborers engaged in cleaning oil tank cars was killed by gas while attempting to rescue one of his men, who had been overcome while in a car. Since it could not be ascertained whether such cars, when emptied of oil, contained dangerous quantities of gas, it was customary to steam or blow them out, but this had not been done when the rescued laborer entered the car, although it had been opened shortly before. The degree of danger from gas was largely dependent upon the temperature and upon weather conditions. Deceased knew that all danger had not been removed, as could have been done, and that no one could fully appreciate its extent. *Held*, that he had not, as a matter of law, assumed the risk.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1068–1088; Dec. Dig. ☞288.]

Appeal from District Court, Jefferson County; John M. Conley, Judge.

Action by Sophia Stalworth against the Gulf Refining Company. From a judgment for defendant, plaintiff appeals. Reversed and remanded.

H. G. Robertson, of Dallas, Guy Robertson, of Port Arthur, and Smith, Crawford & Sonfield, of Beaumont, for appellant. D. Edward Greer and Hightower, Orgain & Butler, all of Beaumont, for appellee.

LANE, J. This suit was instituted by appellant, Sophia Stalworth, surviving wife of Mack Stalworth, deceased, in behalf of herself and minor son, Mack Stalworth, and Adeline Stalworth, mother of the deceased, against the appellee, Gulf Refining Company, to recover damages on account of the death of Mack Stalworth, who lost his life in an oil tank car of appellee, from gas, while rescuing one Red Bradford, who had been overcome by gas in said car while cleaning the same.

Appellant, plaintiff in the court below, charged that the death of Stalworth was caused by the negligence of the defendant company in failing to provide a safe place for its laborers to work, and to provide proper regulations for their safety, and to give them proper warning and instructions, to guard them against the dangers of said employment. The defendant, Gulf Refining Company, pleaded generally that the death of Stalworth was caused by his own wrongs, negligence, and misconduct, whereby he contributed to his death, and, further, that the death of Stalworth resulted from conditions ordinarily incident to the work in which he and his fellow workmen were engaged, that such conditions were known to them, and that in undertaking to do such work, and in continuing therein, knowing the dangers incident thereto, the deceased and his fellow workmen assumed the risk of injury from such conditions, and in defense of the action pleaded that the risks of injury were assumed by Stalworth and his fellow workmen. After the evidence was all in the appellee, defendant in the court below, moved for an instructed verdict, which motion was granted, and the jury, upon instructions from the court, rendered a verdict for appellee.

That the transactions and acts of all parties connected with the accident just before and at the time it occurred may appear, we here adopt the statement of appellant in his brief, as follows:

"The story of Stalworth's death is briefly told. He was one of several negro laborers employed to clean oil cars for defendant company at Port Arthur, Tex. On the day of his death seven cars were standing on the track in defendant's yards to be cleaned. The deceased and three other negroes were sent by Randall, the foreman, to clean them, about noon. When they came to where the cars were, Mack Stalworth, the deceased, who at the time was acting as 'straw boss' or leader, told two of the negroes, Goldstein and Bradford, to clean two of the cars, pointing them out, and that he and Jackson, the other negro, would clean the other two about 50 yards away. Goldstein began to clean car No. 623. It was a three department car; that is, had three divisions or apartments for the oil. It was about 30 feet long and 12 or 15 feet high, and had a pocket in the apartments to empty the oil, and a dome or large hole, known as the manhole, on top about the capacity of a man's body for loading the car. These two cleaned the first two apartments, A and B, without inconvenience or discovering any gas. Will Goldstein then went into apartment C and remained a while and came out, stating that he had swept it out, and for Bradford to go down and get the rust from around the valves, remarking that it was a 'pretty tough car.' Bradford went down, and had the rust up and was gathering it and getting up to leave when he lost consciousness. Goldstein noticed that Bradford had stopped work, and he went to the hole and called him and, receiving no reply, looked in and reached in, and from Bradford's singular action in backing away discovered that he was gassed, and he immediately called Mack Stalworth to help him get him out. Stalworth came and went into the car, but immediately came out, remarking that Red was playing with him. Goldstein said no, he was gassed, and Stalworth immediately jumped into the car, and, taking hold of Bradford, lifted him up through the hole for Goldstein to take him out. Bradford's shoulder hitched or hung on the side of the hole, and Goldstein called for more help, and another party came with a rope. This was a Mr. Meyer. They pulled Bradford

out and laid him across the car, and in the meantime Stalworth was gassed and down, and Meyer went in to get him out, but began to weaken and came out. Then Goldstein went down and tied a rope around Stalworth, and they dragged him out, but he was dead, or died immediately."

The undisputed facts are that the appellee was engaged in the business of refining and selling crude oil and its products, which emitted poisonous gases dangerous to life; that in shipping these oils and their products tank cars were used; that when these cars were emptied and returned to appellee, poisonous gases remained in said cars, which gases were known to exist by the officers and managers of appellee and those familiar with and experienced in handling said oils and their products, and to be dangerous to life; that appellee, knowing of such danger, steamed or blew them out when said cars were to be repaired, which steaming and blowing destroyed the gases in said cars and rendered them absolutely safe from said dangerous gases; that such steaming and blowing was done only when said cars were to be repaired, and that they were never required to be so steamed or blown for the purpose of cleaning them only; that the fact that they were not so steamed or blown so as to render them reasonably safe for entry by those who cleaned them was known to deceased, Stalworth, at the time of his death; that W. H. Randall was foreman of the car department of appellee at the time of the death of Stalworth, and had charge of the men who cleaned the cars; that he had charge of the gang of workmen, including Bradford, the rescued party, and Stalworth, the deceased, at the time of Stalworth's death; that Randall had constituted Stalworth a boss, or subboss of said gang of workmen on and before the time of the accident and made it his duty to open the cars at the top and bottom for the purpose of permitting the gas in them to escape so as to render them reasonably safe for workmen to enter them for the purpose of cleaning them; that Stalworth had accepted this employment and undertook the performance of such duties, and was so engaged at the time of his death; that said cars were opened either by him or by others under his directions. It was also undisputed that all these workmen knew the cars being cleaned by them had not been steamed or blown, and that the general method used by appellee to render the cars reasonably safe from gases so that they might be cleaned was by opening them as above stated, and that such cars had been so cleaned a long time; that Stalworth had been engaged in cleaning and directing the cleaning of such cars for about one year before his death, and was well acquainted with the method used in preparing them for entry; that he knew there was some danger of persons being gassed while working in said cars, and had been often cautioned, and that he was, on the day of

his death, told by Foreman Randall, to be careful, and that if he had doubt as to whether or not such cars were safe to enter, he should not let his men enter them, but should report the condition of the car to Randall; that Bradford had worked at the refinery for about one year and knew that poisonous gases were emitted from such oil and their products, but he did not know fully the effect such gases had on the human system; he knew there was some danger, but did not know the degree of danger. He had only been engaged in cleaning cars for about three weeks. It is further undisputed that just before the gassing of Bradford, Stalworth had directed Goldstein and Bradford to enter and clean the car in which Bradford was gassed, and in which Stalworth lost his life, and that Stalworth lost his life in trying to get Bradford out of the car, after he had been gassed, to prevent his death.

S. J. Dalzell, chemist for the Magnolia Petroleum Company, testified:

"Products of petroleum which will produce such gases as the inhaling of which will cause death at ordinary temperature are gasoline, or the lighter portions of crude oil, which contains a considerable amount of light oils or crude oil of a sulphurous nature, and the crude distillates from them. Vapors will arise under certain conditions in the tank car which has contained gasoline and which has been emptied, except such as clings to the sides or may be left in small quantities in the bottom of the tank. A tank car which has been recently emptied of gasoline, and which has not been aired thoroughly or properly steamed out, would contain sufficient gas to be injurious to any one entering the car. The amount of gas that may be generated in such a tank car varies with the condition of the weather. In cold weather less gas is given off than in hot weather, and more quickly in hot weather than in cold weather. * * * These gases are heavier than air, and will have a tendency to lay close to the bottom of the car. The gas is more dense at the bottom than at the top of the car, and under all conditions it is easier to detect gas at the bottom of the car than at the top. The condition of the atmosphere would affect the time necessary to free such a car of gas. Besides leaving the car open, another method could be used to expel the gas so as to make it safe to enter the car, to wit, steaming it. Steam would expel the gas from a tank car containing gas enough to cause death, and it would only take a few minutes to do so. * * * A tank car which has been recently emptied of gasoline at any temperature, and which has not been properly aired or steamed, would have sufficient gas to produce death by reason of the fact that in emptying a car there is always more or less of the fluid which adheres to the sides and bottom of the car in unloading. A person of practical experience would be in a better position to judge than a person of no experience in detecting by smell the presence of gas that would cause death. There are some gases arising from petroleum and its products which are more dangerous to persons than others. All gases generated from petroleum and its products are dangerous, but those of a sulphurous nature are more dangerous than gases containing a small quantity of sulphurous contents. Atmospheric conditions affect the rapidity of gases passing out of tank cars. In damp weather the gas escapes slower than in dry weather. By the application of steam, tank cars can be blown out so as to make them perfectly safe to enter and work in. A

car can be steamed out by inserting a steam pipe in the opening in the car and the steam turned on until the car is completely filled with steam, and the gas will than have been expelled, which will only take a few minutes. A car in such condition, which demanded immediate cleaning, on expelling the gases could be cleaned with steam or compressed air, otherwise the removal of the cap on the bottom and the dome covering on the top and allowing it to remain open for a sufficient length of time to insure safety to any one entering the car."

J. E. Beggins, the expert chemist of the Gulf Refining Company (this defendant), testified substantially the same as the above witness as to the effect and character of these gases, and further:

"The length of time required to empty a gasoline car of gas depends entirely upon conditions existing at the time, and no definite number of minutes or hours can be given. * * * No definite time can be stated, as conditions vary from day to day. The gas does not take effect suddenly, but rather so slowly that one does not notice that he is being gassed. It would cause a difference as to the kind of car and as to the amount of gas that it contained and as to the number and size of the openings in said car and also the capacity of said car would have in determining what time would be required for it to free itself from gas so as to permit a man to enter the same with safety."

M. C. Van Gundy, the expert chemist of the Texas Company, testified substantially as the foregoing witnesses as to the effect and character of these gases generated from the petroleum products hauled in these cars, and, further:

"A tank car which has contained gasoline and has been empty, but has been blown out or cleansed, will undoubtedly contain vapors of gasoline. If the dome of the car has been left open for some time, these vapors will eventually work out of the car. The length of time which this would require would depend on how completely the car had been pumped empty and the way in which the car was handled. If the tank car has contained light gasoline, there would undoubtedly be sufficient vapors left in the car to cause sickness under any conditions to a person who went into the car. It is a fact that gasoline gases are heavier than air and would have a tendency to lay at the bottom of the tank unless they are stirred up by some current of air. I believe it is impossible to open a tank car and not detect gas at the top, while there may be a large amount of gas in the car, this being due to the fact that the gas coming out of the dome of the car mixes with the air so rapidly that it cannot be detected, while in the car you would not have the free access to the air, and the gas would be readily noticeable. As to whether ordinarily if a car has enough gas in it to produce death how long you would consider it necessary to air it in order to make it safe to be entered, this question cannot be answered, as it would depend on the nature of the product in the car, how completely the car had been drained, and the amount of opening for the gas to escape. * * * Gas contained in a car could be expelled by blowing air or steam into the car. If a tank car which had been recently emptied of gasoline and not cleaned, it would be natural to suppose that it contained gas sufficient to produce sickness or death. The gas would be a natural condition arising from the gasoline which had been in the tank. Poisoning from gases comes on gradually. It may, however, be so rapid that one does not have time to get free from the gases before being overcome. Cars which have contained gasoline and are allowed to stand open for some time will become free from gas, or they can become free more rapidly by the introduction of air or steam. As to whether a man could detect the presence of this gas without special knowledge would depend largely upon the natural intelligence and quickness of wit of the man."

The evidence tended to show that this company steamed out the cars in the repair shops before the workmen went into them to work, but not the cars these negroes worked in; that a process of cleaning oil tanks of gases on barges by compressed air was used. The evidence tends to show that the company had no regulations or rules of any kind as to how, by whom, or when the cars were to be opened up for ventilation.

Will Goldstein testified:

"When I got to this car, No. 623, to clean it, it was open then. I don't know to my knowledge how long it had been open. I didn't see it opened. I didn't see anybody open it, but it had been open very lately, because they never got them placed up till 12 o'clock, because I was on my way up there when the whistle blew. It must have been opened shortly after 12 o'clock. * * * They sometimes open these cars when they are in a hurry that way before they put them on the tracks, * * * the only reason I have for believing this car was opened after 12 o'clock. The usual way that this company conducted its business of cleaning cars was when the car stood on the track to be cleaned the foreman, Mr. Randall, would notify us boys and direct us to clean them, and we would then go and open them and clean them. That was the usual method of carrying on this business of cleaning cars by the Gulf Refining Company. I did not know of the other hands, Stalworth and Bradford, having any instructions or information about the proper way of freeing cars from gases. One man went to open them up, as I first said, and let them air out before going in them to clean them. I didn't know anything as to the length of time they should be left open only from judgment."

It is, we think, conceded by appellee that the evidence tending to show negligence on the part of appellee, as well as that introduced to show that Red Bradford was guilty of contributory negligence, or that he assumed the risk incident to the work in which he was engaged, presented matters of fact which should have been submitted to the jury for its finding, had these been the only issues in the case; but appellee insists that the court properly instructed a verdict for it, because the undisputed evidence shows that the deceased, Stalworth, was boss of the gang, which included Bradford, the rescued party, and it was his sole business to open the cars which were to be cleaned, and to see that such cars were sufficiently free from gas so as to make entry therein by workmen reasonably safe before he ordered or permitted men under him to enter such cars to perform the work required of them. It was also conceded by appellee that if it were shown that through negligence of appellee, Bradford was gassed and thereby placed in peril, appellee would be liable for any injury suffered by Bradford which was the proximate result of such negligence, unless the evidence further showed that Bradford knew of the dangers incident to the work which he had undertaken to perform at and before the

time of the accident and thereby assumed the risk of such dangers. And appellee further concedes that if Bradford was placed in his position of peril through the negligence of appellee without having assumed the risk incident to his labors, appellee would be liable for the death of Stalworth if his death resulted from an effort on his part to save the life of Bradford, unless it were further shown that Stalworth in the careless discharge of some duty of his own had·brought about the peril of Bradford..

We think, therefore, that the only question necessary for our decision is: Was the testimony with reference to the employment of Stalworth introduced for the purpose of showing that by his failure to properly perform duties assumed by him under his employment, Bradford was placed in the perilous situation from which Stalworth was trying to rescue him, and in which effort Stalworth lost his life, and that Stalworth was intrusted with, and had assumed, the duty of opening the cars for the purpose of rendering them safe for the entry of workmen, and that after the cars had been opened for that purpose, he instructed Bradford to enter one of them at a time when it was not reasonably safe to do so, sufficient to show that Bradford was placed in his perilous situation by the negligence of Stalworth, as a matter of law, and to warrant the trial court in instructing a verdict for appellee? May it not be true that, while the servant is held to assume dangers that are obvious, or of which, in the necessary discharge of his duties, he must know, he does not necessarily assume the risk of such dangers which neither he nor any one else knew or could, in the nature of things, know? The evidence shows that Stalworth was a common laborer; that as "subboss" he was placed in charge of other laborers with less experience in the work to be performed than he was; that he knew and was told that it was dangerous to enter and work in cars containing gas. Of course he knew that if one entered and remained in a car containing gas long enough he would be gassed and perhaps killed, but he did not know, and could not be expected to know, when dangerous gases were lurking in the bottom of the cars, which appellee's foreman, Randall, had instructed him to clean, for it is undisputed that no one can, with certainty, tell when such cars can be safely entered, unless they be steamed or blown out, and yet appellee insists that this common laborer assumed the risk of dangers of which, in the nature of things, no one could fully know. The place in which Stalworth was directed to work was a dangerous one, the danger of which could not, by reasonable diligence, be known and appreciated by him, the dangers of which could only be removed by steaming or blowing out the cars, and this was not done by the master in this case.

[1] As to whether Stalworth was guilty of any derelection of duty contributing to Brad-ford's perilous situation, we think was a question which should have been submitted to the jury as an issue in the case. In Oil Co. v. Barnes, 120 S. W. 1023, at page 1028, it is said:

"A servant never assumes the risk of conditions of which he is ignorant and is not charged with knowledge of, and not then, unless he may reasonably apprehend or appreciate the dangers incident to such conditions."

"The fact that the servant knew, or ought to have known, that there was some danger does not excuse the master if the danger was greater than the servant, in the exercise of due care, had reason to anticipate, and the amount of the danger and the circumstances that led the servant to encounter it are properly questions for the jury." Wood's Master and Servant, § 387, p. 776.

In Orange Lumber Co. v. Ellis, 105 Tex. 363, 150 S. W. 582, speaking for the Supreme Court of this state, Justice Dribell says:

"The general doctrine of assumed risk, as laid down by the text-writers, to the effect that, where a servant undertakes to perform any particular service, he assumes as a part of his customary obligation the ordinary perils which, in the nature of things, are incident to such service is not applicable to the performance of such services with defective machinery, unless such defects are known to the servant and at the same time he knows and realizes, or from the circumstances of his position should know and realize, the possible danger that might result from the use of such defective machinery. As circumstances to be considered in such a state of case as above are the inexperience of such servant as to the particular work, his right to rely upon the general duty of the master to provide a reasonably safe place for him to work, and where the master has undertaken to provide means of safety for the servant against danger resulting from the operation of defective machinery, known both to master and servant, the right of the servant to rely upon the sufficiency of the master's improvised means of safety. Where such questions are raised by the evidence, it is not within the province of the court to say, as matter of law, the servant has assumed the risk. The issue becomes one to be properly submitted to the jury. There is also another principle of law that is applicable to the subject under review. The general rule that the servant assumes the risks incident to his employment, where he enters or continues in the service of the master after knowledge of defective machinery employed in the performance of his work and knowledge of the ordinary danger incident to the use of such machinery, does not consequently imply that he assumes the risk of every possible injury that may result from the use of such defective machinery. Under such circumstances he does not assume the unusual and extraordinary risks of which the master knows, or which he should know or foresee, unless such risks are obvious, or such servant has actual or presumptive knowledge of such danger. The knowledge which bars the servant of recovery where he enters or continues in the service with defective machinery is the complete appreciation of the risk, and not a mere apprehension of possible danger. The servant assumes the risk of every probable danger, but not of every possible danger. If the injury inflicted by the use of the defective machinery is an unusual or extraordinary consequence and not such as might have been reasonably anticipated by the servant, he will not be barred his redress.

"It has been suggested by learned counsel for the defendant below that, in anticipating extraordinary or unusual dangerous results from the use of defective machinery, the master and servant are upon equal terms. We do not think this the case where the injury results from

the use of defective instrumentalities known to the master, notwithstanding the servant may know of such defects, for the reason that the master is under obligation to furnish the servant with reasonably safe instruments with which to prosecute his work, and where he supplies instrumentalities for work known to him to be defective and insufficient, he is at fault, which is not excused further than the servant will not be permitted to recover damages for injuries growing out of the use of such defective instruments where he knows of the defects and the injury received is the ordinary result of the employment of such machinery. The denial to the servant the right of recovery under the condition named is not an excuse or justification of the master for furnishing the defective instruments of labor. His obligations do not cease. The servant assumes the risks only that are ordinarily and reasonably expected to follow from the use of the defective machinery, and where the injury inflicted is unusual or extraordinary, the servant is excused, but the master is not. He is at fault, and, by supplying defective machinery for his servant to work with, knowing of such defects, he is liable for every possible injury that may result from such neglect, except such ordinary results as the servant may be said to assume when he knows of the defects and is not presumed or shown to have known of the possible results of the use of the defective machinery. * * *

"Labatt on Master and Servant, vol. 1, p. 721, § 298, announces the law on this subject to be as follows: 'The ultimate proposition which, as already stated, is implied in the decisions mentioned under the preceding section is that, in the absence of some special element which suggests a sufficient excuse for his conduct, a servant is chargeable, as a matter of law, with contributory negligence if he goes on working after he has ascertained that an extraordinary risk, creating an ever-present possibility of injury, has been superadded to the incidents of his employment. The knowledge which this doctrine contemplates is the complete appreciation which, as shown elsewhere (section 271, ante), must also be established before the master can protect himself by the defense that the risk was assumed. The servant's continuance of work with a mere apprehension of possible danger is not such negligence as will bar his action.'

"It is shown by the findings of fact in the certificate that the accident was the result of the negligence of the defendant below, and was an unusual occurrence. In view of this fact the burden was upon the master to show that the servant knew, or by the exercise of ordinary care should have known, of this possible danger. The employé is only presumed to assume the dangers usually attendant upon his employment; and, when he shows that he has been injured by a cause or danger not usually or reasonably attendant upon his employment, he is then entitled to recover, unless it be shown he knew of such unusual and unreasonable danger, and fully comprehended its nature at the time of his employment or before the accident happened. The evidence in this case having established the fact that the injury to the plaintiff was caused by a danger which ought not to have attended his employment, and would not have attended it if the defendant had performed its whole duty towards him, there is no presumption that the plaintiff assumed the unusual risk, and the burden of proof is on the defendant to show affirmatively that he did." Nadau v. White River Lumber Co., 76 Wis. 120 [43 N. W. 1135, 20 Am. St. Rep. 29]; Labatt on Master and Servant, vol. 2, pp. 23, 24, § B."

[2] The evidence does not show that Stalworth had the right to employ or discharge the men whose work he was to direct under instructions from appellee's foreman, Randall. All the testimony shows that, while Stalworth knew that appellee had not removed all danger of gas from the cars to be cleaned, as it could have done, he knew there was some danger if one remained in the cars too long, but it is further made clear from the testimony of the expert witnesses, Dalzell, Beggins, and Van Gundy that no one could fully appreciate the dangers of the lurking gases, which always remain in said cars to some extent, unless they be either steamed or blown out. It seems to be conceded by both parties that there are many things which must be considered in determining when it is safe to enter such cars, unless they be either steamed or blown out. Therefore it can hardly be insisted that Stalworth fully appreciated the dangers of gases in the car when he directed Bradford to clean it out.

We are of the opinion that the trial court erred in instructing a verdict for the appellee, for the reasons hereinbefore pointed out, and for such error the judgment of the court below is reversed, and the cause remanded.

Reversed and remanded.